May it please the Court. Richard Paul for Pacific Bell. This case presents to us important issues of jurisprudence under the ADA, Title VII, Federal Rule 408, and the Mixed Motive Instruction. To us, the verdict stands on four different pillars, like the chair, and if each of those pillars is flawed, the chair may tumble. And I'd like to address in order the cause of action itself for failure to reinstate in its parameters, the Rule 408 admissibility issues, leaving the ADA issues and the Mixed Motive Instruction for my final comment. I have a lot of questions of both counsel here, but I want to know first off in terms of, was it, where was, was there ever a determination in the proceedings that Mr. Josephs was in fact, if they had known everything about him, was he qualified for the job? Was there ever any determination about him being qualified? The answer to that is yes and no, and it depends on what we mean by qualified under the ADA. Did he possess the normal wiring and technical skills to hook up telephones? The answer is yes. But an important issue in this case. Well, one of the qualifications of this job is that people have to go into the homes of other people. And obviously, there's a, and that, is it, you don't call it Pac Bell, what do you, SBC, I guess is. Well, we used Pac Bell down below. Okay. That obviously, if you send people in that have violence in their past into homes, and you know about this, and someone were hurt or some incident occurred about, you would put yourself in a position for a lawsuit, right? No question. No question that that's the case. And therefore, it has been our view that part of the qualification for the job is to have a record that is free from the taint that creates that problem. In other words, I think this case is very much like the Murphy case before the United in that case with high blood pressure. And an individual with high blood pressure was held not to be capable to be an over-the-road driver, not because he couldn't drive a vehicle appropriately, but because the Department of Transportation had regulations that said someone with that circumstance would not be appropriate for the position. And it is our view that in this particular job, an in-home customer service job, part of the requirement for the job, part of the qualification for the job is to have an absence, if you will, of a record of violent behavior that might expose the company to significant legal liability. Obviously, it sat on the razor's edge that the Palmer case in the Seventh Circuit discussed between the doctrine of negligent hiring, between the liability for taking someone precisely under this circumstance and putting them in a customer's home. All right. So if all of this information would have been available to the employer at the time that Mr. Josephs applied for the job, he would not be qualified for the job, correct? That is correct. And that testimony was given in trial, but a portion of that testimony was actually ruled inadmissible by the trial court compounding the problem, because a witness for the company, Karen Hubrick, testified that it does not matter whether someone committed a violent attempted murder because they are a criminal or because they did so under the influence of a mental disorder. We do not, she said, place in customers' homes persons with that kind of violent past or child molesters. And it does not matter to us whether the cause of their difficulty, the cause of their behavior emanated from an ADA-protected mental disability or from simply defects of character, bad upbringing. It doesn't matter. And that freedom from that kind of record is a qualification of the job, in our view. And on that basis alone, the verdict should be set aside. Well, how, what was the, you know, from the standpoint, I guess, that I'm saying that obviously if you had hired someone with Mr. Josephs' past and he ended up hurting someone, you would concede that the employer would have responsibility for sending that person into the home. I mean, it would certainly be, I mean, there would be a cause of action that could be stated against the employer. Now, the jury, on the other hand, found that, found for the employer saying that termination was fine, but you have to take him back. I mean, you should have taken him back, and therefore he's entitled to $500,000 plus, right? That's what the jury found. Yes, ma'am. So, what, you know, I guess I'm trying to figure out what, in your view, were the errors that, you know, what did the jury, did the jury make a determination that he was ever qualified for the job? I know that you're contesting that they never should have been instructed on reinstatement. Yes, among other things. Right. That the cause of action itself or the claim itself is not one that should have been recognized to begin with. But I think to address what Your Honor appears to be struggling with, in the initial termination decision, the company made its decision based on the fact that Mr. Joseph had lied on his application, he lied about having ever worked under a prior name, he lied, as it turned out, deliberately to conceal his past, and he falsely answered a question about whether he had ever been convicted of a crime. Among other things, he had been convicted of battery on a peace officer, and he lied about his name in order to cover up those prior convictions. So the termination decision was based on that ground alone. The company didn't need to get to an evaluation of whether he was qualified in the sense that we're talking about, because it made the decision based on the fact that he had violated a clear company rule with respect to candor on his application. Well, the jury apparently found that even though his termination was proper, that people who were not disabled, who had been terminated, were taken back under a variety of circumstances, and he wasn't. And they inferred that the difference between him and the ones who were taken back was his disability. There were two, and only two, pieces of evidence from which the jury could have drawn its conclusion. One is, as Your Honor recites, the existence of these other cases, some of which I might add involved individuals who had never even been hired until a year after Joseph's termination. But the second ground on which a verdict could be sustained were two isolated comments made in the grievance settlement discussion, one by a Mr. Smith and one by a Mr. Cruciati, to the effect that they had concerns about legal liability if Mr. Joseph's was allowed to be hired. And in closing argument, counsel argued that that articulation of a concern about Mr. Joseph's being in a customer home was evidence of regarding him as being disabled, and therefore would support a verdict. And the problem was that the instruction given by the court, the only one half of the Hopkins instruction, the instruction limited to only determining whether awareness of disability was a motivating factor, I think allowed this jury to say, well, they knew that he had a disability. At least they knew he had been found not guilty by reason of insanity. There's a whole other question, of course, whether that's a disability at all. Well, it can be regarded as a disability even if it isn't actually one under the statute, correct? If one regards someone as having been found not guilty by reason of insanity, we submit that is not regarding someone as having a disability. Because what one must regard someone as having is a mental condition that qualifies under the act. And legal insanity is not a mental condition, as we all know. It is a judicial determination of lack of criminal mens rea and responsibility. So there is fundamentally a question. That doesn't mean that an employer can't regard someone as having whatever a mental disability turns out to be. They're not lawyers. They're not all lawyers anyway. And if I ask, you know, 100 people on the street, as someone who's been found not guilty by reason of insanity, do you think they've got a mental disability? Probably 90 of them will say, well, probably. So I guess I don't understand your argument about why he couldn't have been regarded as disabled even if technically he wasn't. It is simply the observation that the evidence suggested that what the employer regarded was that there was a legal question with respect to liability if he were to work in the narrow confines. But on this piece of the evidence, we have to view the evidence in the light most favorable to the jury's verdict. On the termination, you get all the inferences, but on the failure to rehire, he gets all the inferences, correct? Yes, Your Honor. Okay. Of course. And so the jury did determine that he was regarded as having had, apparently, a mental disability in connection with his past. And that's a finding that we have here on appeal, and I agree that that intent must be given in favor of Mr. Josephs. But with respect to the ADA issues, ultimately, the most important ADA issue is the one of whether he was regarded as being disqualified from a wide range of jobs or merely from the job that required this kind of customer interface, an in-home service position. He applied for an in-home service position. He was dismissed. He grieved his dismissal. He sought reinstatement to an in-home service position. And even if he was regarded as being disabled with respect to that in-home service position under Murphy, under Kirkenberg, under Sutton, the trilogy of Supreme Court cases, that is regarded as, with respect to a narrow range of jobs, a specific job that has very specific qualifications for it and very specific responsibilities in it. And it's different than regarding someone as being fundamentally incapable of working, the major life activity of working in a broad range of jobs or a broad class of jobs. So the important ADA issue on this appeal, among others, is the question of whether or not, even if, given all intendance to the verdict, he was regarded as presenting a disability or a possible disability of some sort, whether that still interfered with the major life activity of working generally. And we submit on the cases cited it did not. Yes, sir. Now, as I understand it, as an employer, you have access to criminal records maintained by the state. Am I right? Uniquely, as a public utility, with service technicians having the privilege of going into consumers' homes, we have access. The average employer does not. And do you have access across the board for any position you're seeking to fill or just for positions you're seeking to fill which require the employee to go into a person's home unsupervised? My recollection of the statute is it's the latter. And it's public utilities that have that access? Yes, Your Honor. Are there any other groups or classes of employers or potential employers who have like access? Government entities. And where does that authority come from? Is it by reason of legislation or is it by reason of some administrative rules? It's legislation. It's contained in the California statutes. I apologize. It's in our brief. Okay. Okay. Thank you. And the important point, of course, is that that legislation suggests both a heightened responsibility to do due diligence with respect to these in-home positions and the very technique, i.e. fingerprinting, that allowed the discovery of Mr. Joseph's covering up his past. And therefore, it seems to me it suggests that it is the public policy of California that where persons are discovered through that process who present issues of potential danger to the public by being placed in an unsupervised responsibility in-home, that implicit in the access to that information is responsibility to act with. Well, now, in the complaint, what causes of action were you on notice for? When do you first find out that you're going to have to deal with this failure to reinstate? Oddly enough, not until quite late in the game. The first amended complaint introduced an ADA claim based on the termination. At the time of the motion, it was later amended to the second amended complaint, and then at a time for motion for summary judgment, attacking the termination claim, because all of the people who lied were terminated, counsel for the respondent for the first time said, well, wait a minute. I have a theory of the case that has something to do with people who had grievances and who were reinstated. And there was quite a colloquy as the court struggled whether or not that evidence really related to the termination or whether there should at that point be some sort of leave to have a separate claim with respect to the grievance process. So it was truly not until summary judgment on the first round of the pleading that the issue of the potential second claim was raised. And quite late in the game, an amendment was allowed to articulate as a separate cause of action or claim. And that was a failure to reinstate. Two years, perhaps, into the litigation, if memory serves me right. Now, so the error that you're claiming, so you did have notice that he was claiming that he had both a wrongful termination and a failure to reinstate. No, we did not, not at the time of the original charge. No, but when we're at the trial, when we're at the trial, part of it, you're claiming that the jury should not have been instructed on failure to reinstate, right? The court had ruled in pretrial rulings that it would allow, over our objection, of course, the matter to go forward on both a termination and a failure to reinstate theme. And the matter was rather thoroughly briefed before the trial court. And the problem that the trial court struggled with is this Hall's case, what to make out of it. Because as the court knows, it's Collins' decision is rather clear, that a grievance is merely functionally a request to reexamine an action previously taken, and not the springboard for creating yet another claim with a new statute of limitations and a whole second round of litigation based on the denial of the grievance. And that is what Collins says, that is what McCall says, that is what a variety of other cases say. Well, Sal, probably in hindsight, if your employee had said originally, we're going to fire you because you lied, and as well, if we had all the information that we know about you now, we never would have hired you because you don't qualify for this position, because you can't be, you know, with your violent past, you can't be in a home, right? Could well have been an alternative ground on the facts of this case. It was not. The employer didn't need to go there because it had, just like in judicial decision making, an adequate alternative ground, if you will. Importantly, though, after this second cause of action was introduced and the debate about whether Hall's applies what was gone through, we get to the question of the admissibility in support of the second cause of action of the statements from the grievance proceeding. And the Rule 408 issue has been briefed. The Dirts case that we cited to the court is precisely on point with respect to whether grievances should be a separate cause of action, and we have briefed cases to the court that the statements made in the resolution of Mr. Joseph's grievance should not have then been admitted into the court for proof of liability, which is precisely what Rule 408 forbids and precisely what occurred in the case. But an employer could exercise a lot of discrimination in that reinstatement procedure, where they pick and choose who they're going to reinstate on these convictions based upon race. Now, surely that is not permissible. Or any other claim of bias. And that in itself could be reprehensible, and that's the arena the plaintiff got this case into, is it not? That is the issue of concern to all of us, and the answer to that issue is not that an individual claimant should then have a whole separate round of litigation. I think the way to harmonize all of these cases is to go back originally to the EEOC versus McCall case, the 1980 case and the Sixth Circuit that preceded it. Are you familiar with Indah versus United Airlines? I am. Okay. Why isn't this analogous to, that's a true rehire, but this is a reinstatement. Why wouldn't that be the proper analogy? Because Indah, Norfolk, Poolaw, and those kinds of cases each dealt with a circumstance where there wasn't a request to reconsider in a grievance, something that was done. There was a new application after changed circumstances, significant external events. In Poolaw and in Norfolk there were police reinstatement cases. Why isn't the, to follow up on Judge Levy's question, why isn't the existence of a procedure by which some people end up rehired or un-terminated after termination a separate and distinct decision-making process that can be challenged for bias? It is, but in this sense, as I was about to say, I think that the way Title VII contemplates that this occur is in the special jurisdiction given to the EEOC under 42 U.S.C. Section 2000E6. What really hauls is, is a pattern or practice case. It says there's a pattern, as Judge Levy's question suggests, a pattern of discrimination in the administration of this grievance and arbitration process, and the law is such that only the EEOC can bring pattern or practice cases. That jurisdiction is vested to it in 2000E6, and there are special elements for a pattern or practice case that are separate and distinct from an individual grievance, so that we don't have the circumstance here where there is the opportunity for employer manipulation of a process with no remedy. It is that when one is going to then measure a whole series of different adjudications, one must then proceed as a pattern or practice claim, and only the EEOC can bring that sort of claim, to then allege that what these settlements are is a subterfuge to violate Title VII or the ADA, as the case may be. And the mischief here is allowing this case to proceed by an individual on a pattern or practice theory based on events not only occurring up to the time of his decision, which was Hall's, but based on events occurring quite a bit thereafter, and to segregate them. Thank you. Thank you, counsel. We'll hear from the other side. Your Honor, I'd just like to introduce myself. William Berman, the trial counsel in this matter. Mr. Germano. May it please the Court. Ray Caramani on behalf of Respondent Joshua Joseph. Your Honor, I'd like to address one of the questions Your Honor mentioned, the first question. I'm very troubled by the fact that I think if you hired someone with all the information, if you hired that person, I'm very concerned that an employer would be liable if something occurred in the home, but by the same token, what this verdict says is the employer is responsible if they then don't take them back. So if they'd taken them back, they'd be subject to a lawsuit. If they don't take them back, they have to pay $500,000. I'm concerned about that. And I'd like to address that point, Your Honor, because I think the jury did have that argument presented to them, and they rejected that argument by Packbell that Mr. Joseph was not qualified, even had they known about his past violent acts. And the reason I say that is, look at Packbell's conduct with the other employees who were similarly situated to him. Well, how similarly? Did any of the other individuals have any mental health issues in their components? That's what I want to know. On similarly situated, I can see that there were some not that similarly situated. They did have criminal convictions, but one had a petty theft, and, well, I don't know. I've got them all written down what they were. Well, that's the whole issue in this case, Your Honor. Mr. Joseph committed a violent act of attempted to remove a respirator from someone in 1982 when he was mentally ill. He goes and works for Cox Communication, works as a service technician. The same job he had with Packbell. For 11 years, enters thousands of homes. He's obviously rehabilitated himself and starts to work for Packbell. How long is he going to have to pay for something he did while he was mentally ill 16 years earlier? Is he going to have to pay for the rest of his life? Now, if Packbell had a concern about his violence, not about his mental illness, which is really what they should have been concerned about, why did they bring back Arturo Gonzalez, who had a felony conviction for beating his wife and spent a year in custody? Why did they offer Colin Morris, someone who had been convicted of possession of marijuana with an intent to sell a felony? Why did Jeff Smith, the same person that refused to bring Joshua Joseph back, tell him, if you get your record explained, we'll let you come back to Packbell? Why did they allow Tejeda, whose father was friends with Smith, say, we know you stole a candy bar, but you can come back? Well, they would be exposed to the same type of liability for allowing these employees to come back. They would have had greater exposure for a lawsuit than for someone who committed a crime 16, 17 years prior, with no incidences of violence, who had entered thousands of people's homes and hadn't committed any violent acts. Well, now let's assume that we can agree that all of these persons that you've mentioned have in common that they're liars, right? They lied in their application. Can we agree to that, that they're similarly situated for openers by being liars? I can tell you, Your Honor, that we presented the facts to the court. But I understand what the court is stating, that Mr. Joseph did fail to reveal a criminal conviction of his employee's actions. There was some issues as far as why he failed to do it that was less, that was more excusable for why he failed to reveal the issue. But didn't the jury say that the termination was okay? Yes. And they said it was okay, I assume, because this employer had a right under the law to terminate these parties who had in common being liars. Is it more complicated than that? Or how do we distinguish one of these applicants from another? You say I can't say that they have in common that they're liars in their application. Well, they all failed to reveal a criminal conviction on their employment application, and that's why. When asked whether or not they had been convicted, they said no. That's correct. So that's a failure to disclose, as opposed to my characterization of it as a lie. We'll live with that, okay? Now, let me pursue you. What distinguishes this man from the others is that he has been found not guilty by reason of insanity. And that's what differentiates him from them, is it not? Is there anything different about them that is significant other than the fact that this man has been found not guilty by reason of insanity? I just want to make it clear. The false statement that Mr. Joseph made on his employment application was not his attempted murder conviction. I understand. It was a conviction that occurred after he was acquitted, or after he was found not guilty by reason of insanity. That's correct. And that was the basis of the Pact values. I'm with you. Now, that's it, is it not? That's what distinguishes him. No, the distinction is that he had spent time in Penn State Hospital, and Pacwell was aware of his stay and his autobiography. But they don't know that when they hire him. No. Now, in order for him to be institutionalized, he has to be, in addition to being mentally ill, adjudicated to be dangerous, does he not? He has to have been adjudicated that he probably committed a violent act, or a criminal act, while he was mentally ill. And if he's going to be institutionalized, he has to be adjudicated dangerous. Am I wrong? No. In California, you have two phases. You plead not guilty, then you plead not guilty by reason of insanity, because this is in California, right? All right. What happens is, in the first phase, you're found guilty, and then in the second phase, you're found not guilty by reason of insanity, and then the court can put you in a mental institution up to the maximum incarceration of whatever attempted murder was, I think, nine years. Then after two and a half years, he has a restoration of sanity, and then it's up. But there's two phases in California. It's a guilt phase, and then there's the not guilty by reason of insanity. So to get there, you had to be found guilty first, and then you're found not guilty by reason of insanity. My understanding is he didn't go through two phases, Your Honor. He just pled not guilty by reason of insanity and agreed to the sentence of nine years. There was a change of plea. There was a minute order with a change of plea saying that he's entered a plea of not guilty by reason of insanity, and he's going to do nine years in custody. So I don't believe there was an actual hearing where they found him guilty, and then he entered the plea. And I'm not sure what the... So other than the commission of the act that led to the criminal proceeding in 1982, was there any adjudication as to dangerousness or lack thereof? No, there was not any criminal adjudication of dangerousness. He entered a plea of not guilty by reason of insanity. And for that reason alone, he goes into the hospital? Well, it's because you're admitting the offense that you're charged with, essentially, and so everything of the attempted murder comes before the court. So then the court has the range, then determines if you were not guilty by reason. If he had been found, if the court found him sane, then the court could have sent him to prison for nine years. The court could have sent him to prison. But the California does have a labor court section that states that, and it's my argument, that states that being found not guilty by reason of insanity is not considered a conviction. And that's why his failure to indicate that as an employment application was not a false statement. The only false statement was the failure to indicate the misdemeanor conviction. Well, he got out before nine years was up. That's correct. And didn't he – did he not stay in the institution so long as the court continued to conclude that he was dangerous and he was only released when the court found that he was no longer a danger? That's correct, Your Honor. So he never – he could have gone in there and come out just as soon as he was adjudicated non-dangerous. That's correct. And so dangerousness is a factor in his being institutionalized in this scenario under the law of California. Am I wrong? I believe that's a logical – Okay. Now, what this employer thought of this man was that he was dangerous. Wrong? That's correct. He thought he was dangerous? They thought he had a potential to be violent because of his mental illness and not because of his past violence. Well, okay. But a person could be mentally ill without being dangerous in which event that person, as I understand it, would not be a candidate for institutionalization either in California or anyplace else. That's true, is it not? I'd assume – I could understand – I mean, I'm not exactly sure the answer to that. Well, doesn't the fact that he is institutionalized tell us a whole lot about what a court thought about his dangerousness? Yes. Yes. And the public policy of the state of Oregon – of California is to open up to a utility, as I'm told, access to a record for the purpose of telling the employer, this person has these criminal convictions in another context, and you better be careful if you're going to put him in a home unsupervised. Now, what distinguishes this man from the others who were reinstated is he has an adjudication that he was not guilty by reason of insanity and at least a continuing adjudication for a period of time that he was dangerous. And if I recall correctly, the Court did not allow – terminate his commitment until it adjudicated the fact that it thought he was no longer dangerous. Now, that's my belief that the record is to that effect. Now, you correct me if I'm wrong. I'll correct you, Your Honor. Okay. Now, the jury imputed to the employer the proposition that the employer regarded him as having a disability. And the evidence that you have of that is that the employer was hung up on the issue of dangerousness. Am I right? Could you – I'm not quite following what you're saying. Well, we have a jury imputing to the employer the proposition that the employer regarded this employee as having a mental disability. That's correct. True? And that imputation comes from a finding of fact made by the jury that the employer regarded him that way, whether he is in fact disabled or not. Right. He's imputed to have a disability by the employer. Yes. And the vehicle by which the employer is adjudicated to have imputed to this man or having regarded him as disability is because the employers focus on dangerousness. That's correct. Now, that's a long way around the barn, isn't it, to put it bluntly? Right. So, now we have, as a policy of California, telling this employer, you better know who you're employing when you send somebody into a home. We'll give you access to criminal records so you know who these people are and you're responsible for knowing. And then you find out that this guy is convicted of assaulting a police officer. Some years, a couple years after he's adjudicated to be not guilty by reason of insanity to an attempted murder. And because they expressed some fear that he is dangerous after court has adjudicated him to be dangerous. Right. That constitutes the employer regarding him as having a mental disability limiting his ability to work. Right. Yes, Your Honor. That's this case. Well, I wouldn't quite say that that's this case. I understand the Court is stating that what choice did Packville have when they know about Mr. Joseph's past acts of violence in 1982? Yeah. But I pointed there, if they were truly concerned about his past violent acts in 1982, their conduct during the reinstatement proceedings would have been different. They wouldn't have brought back the other employees that had criminal convictions, some of them violent, some of them very serious, and bringing them back to protect, if they were really concerned about protecting their customers from people with criminal conduct. Our distinction in this case is that they saw Mr. Joseph as someone who was mentally unstable because of his actions while he was mentally ill in 1982, and not specifically his criminal conduct in 1982. And the ADHC... Well, does a mental disability with dangerousness make a person more dangerous than otherwise? Well, my understanding of the case law states that if someone commits a violent act while they're mentally ill, that act cannot be used against the individual in the future. Well, it's not a conviction in the same sense, but that doesn't mean that it would make you eligible for every job. That's correct. And just to note, there was a jury instruction that informed the jury that an employee may consider past acts of violence in their decision-making process. So the jury instruction number 19 specifically addressed that issue. Was that as to the termination or the reinstatement? As to both. Well, there was a jury instruction specifically informing the jury that an employer may consider past acts of violence when making employment decisions. The jury considered that jury instruction and didn't believe that in this case, Pack Bell, the real reason for not reinstating Mr. Joseph was his past criminal conduct. So in other words, you're saying the jury verdict necessarily found or shows that the jury found that the focus on dangerousness was pretextual and that its real focus was on we don't want somebody who is crazy around us. So because of the instruction that said it's OK if it was dangerousness, it's not OK if it was mental illness. Yes. Yes, Your Honor. That's our position. And I think that's consistent with the statements they made at the reinstatement hearing. And what was the evidence that supported the jury's finding that dangerousness was not the real reason but mental illness was? Well, at the Step 3 grievance proceedings, the union representative asked the VP, the vice president, why have you allowed Mr. Tejeda, who had two criminal convictions and he had expunged his criminal conviction, to come back and be reinstated? And why didn't you allow Mr. Joseph to come back? And the VP didn't state, well, Mr. Joseph committed a violent act. He said, well, Mr. Tejeda had to spend time in a mental institution. And we can't bring people back who spend time in a mental institution. Specifically, therefore, referring to his mental illness and not his acts of violence. So if that evidence isn't admissible, then that would be a problem? Well, that evidence is direct evidence of the discrimination. We also have circumstantial evidence of the discrimination in that other employees who were on probation at the time they relied on their employment application and specifically admitted to the line of their employment application were allowed to go back, get off probation, expunge their records, and come back. And one of them had a battery conviction, a two-year-old battery conviction, where he had spent a year in jail for beating his wife. And Mr. Joseph did have his conviction expunged, correct? Yes, he did have his conviction expunged. At step two and step three, he asked for a reinstatement after expunging his criminal record. And the pack belt stated, no, we will not allow someone with his background to interface with customers. They asked for him to work in other positions other than as a service technician, as a supply service. And they said, no, well, someone might walk by while he's working as a supply service. So basically they said that any position at pack belt he would not be qualified for because of their belief that he had a mental illness and that he would go off on someone because of his past. So I think what their concern was really was his mental instability, that he had the potential of being mentally unstable, rather than he had committed a violent act in the past and he had not rehabilitated himself. I want to make clear to you and give you a chance to respond to my concern here. You understand that I see a difference between being mentally ill and being mentally ill coupled with dangerousness that warrants commitment. You see, a person can be mentally ill, seriously mentally ill, and never be subject to commitment, right? That's correct. But once a person is subject to commitment, that carries with it not only mental illness, but dangerousness to himself or to another. And in what I read in this, this employer is articulating the fact that this person has been institutionalized. Now, not just a naked statement, well, he's mentally ill, and I'm afraid of him because he's mentally ill. And I see a distinction there, and I want you to talk about it if you choose to. I will, Your Honor. There isn't any evidence directly on point as to why Mr. Joseph was institutionalized. He could have been institutionalized for the fact that he didn't care for himself. Now, there is an inference there that because of the fact that he did pull the respirator from him. Oh, no, no, no, no, no, no. That's completely wrong because if you – the charges are attempted murder, and attempted murder is a violent felony in California. That's why he was institutionalized. That's why he didn't go to prison. He was institutionalized for the mental component that affected his men's ray at the time that he committed the crime. So it's not that he was unable to care for himself or other individuals. That's not why they institutionalize people. I'm not guilty by reason of insanity. That's why you go to an institution instead of prison because we've made a determination in our cases that if people have mental – in their ability to form the mental state required of a crime, even though they committed the crime, we're going to put them in an institution until they restore – their sanity is restored and they're safe to return to society. And they can be held up to the same period of time as if you sent them flat out to the maximum for prison. So, you know, in this instance, there's clearly he wasn't institutionalized for being unable to take care of himself. And if that's the court's position, I'll assume that position and say that – assuming that he was institutionalized for committing a violent act, we have to look at the fact that the court has found him at some point and then the mental institute has found him at some point to no longer be a danger. And once they – the courts and the institution finds them to no longer be a danger to society, the PACFEL would not have the concern of a liability in the future because they could come back and say, we've hired this person after the courts and Penn State Hospital have found him to be no longer a danger to society. So I think they would be covered from liability in that instance. And for the fact that someone who's mentally ill should at some point in life be able to regain his sanity and lead a normal life. And if an institution has found him to be sane, then I don't think an employer who hired that individual can later be sued for acts that he committed before his sanity because the institution has found him to no longer be a danger to society. So would it also be your position that if they had decided not to hire him in the first place based on that, that they couldn't do that either? I would say that if he's found to have regained his sanity and he had committed an act that was violent while he was mentally ill, which is less culpable than someone who is not mentally ill and commits a violent act because that person has their faculties and is able to make a decision, knows the difference between right and wrong. But seeing if they articulated a lot of the mental health system is restoration of mental health is dependent on taking medication. And let's say the employer said, you know, I know that this criminal justice system has maintained that he's restored to his sanity and he can go back in society, but that's contingent on him taking his medication. I don't want to be worried about whether he takes his medication or not. You're saying an employer couldn't say, well, I'm concerned about that violent act in the past, and I'm just not prepared to take the chance. No, they can. If an employer had believed that Mr. Joseph was currently mentally ill, that's really the issue of direct threat. If an employer believed that an employee is a direct threat to them, they can refuse to hire them, but they have to take certain steps before they do that, such as having a mental examination and doing some testing. Once they do that, then they can then. But I guess what I'm saying, if you believed that they were violent, too, you know, and along with the mental illness, you're saying that that. Because obviously, if you're if you're violent with no mental illness, you're not necessarily being violent right that day on the interview. But and the employer could still say, well, the fact that you've committed an act of violence in the past is, you know, I'm not willing to take a chance. Now, the fact that he committed an act of violence in the past, can't the employer just say, you know, I'm not willing to take a chance on that. It's violence. If it's based again, I think we go back to the fact that if the employer bases it on the violent act and not his mental illness, they can do that. And the jury had a specific instruction stating that they can do that. If the jury had believed that Packbell had refused to reinstate Mr. Joseph based on his past violent acts and not his mental illness, then I think the jury would have rendered a different verdict. They took the totality of the fact and determined that it wasn't. Did the jury get to hear what the past, what the act was that was the basis of not guilty by reason of insanity? Did they get to hear that? They were not. The court did not exclude that evidence. So they had every opportunity to hear it. We had a 187-page autobiography that the jury had a chance to take a look at that outlined all the incidences. Defense counsel had every opportunity to go into the details of what had happened, and I believe they did. Counsel, you have much exceeded your time, and I think we understand your position. We allow the opposing counsel to go on a bit, so you may have three minutes for rebuttal. And I have a question for you as well. What is the evidence in the record with respect to in the grievance-slash-reinstatement process as to whether there were any positions available that did not involve going into people's homes? The evidence is this, that the position under consideration was the in-home service tech position, that there was colloquy during the grievance, well, what about a splicer position? And the answer was that that wasn't being considered at that moment. By whom? It wasn't being considered by the employer? By the employer, and the reason for that is twofold. Number one, splicer is a promotion under the union contract. Number two, there are seniority rules under the union contract with respect to it. And number three, in a regarded-as case, unlike a regular disability case, there's no duty of reasonable accommodation. That's the circuit's opinion in Kaplan, a 2002 decision, as I recall. And so at trial, counsel for Josephs argued, well, they should have just accommodated him and put him into a non-in-home service position. But that was not a duty, and that was not what was under consideration. The only thing people were thinking about was the job from which he had been terminated, the in-home service position, and his qualifications therefore. It is also not the case, I think counsel took some liberties in describing what the evidence in the record was. What the evidence in the record was was that the legal counsel said, the reason why you should not take him back is we have legal concerns with respect to reinstating him and putting him into customers' homes. There specifically was not a finding by legal counsel that he was violent. One cannot do this sort of testing and determination under the ADA in any of the court counseling. It seems to me I read that someone in one of these meetings, though, had said that you can't come back because you were in a mental ward. In the third meeting, a comment was made, well, Mr. Tejeda, who we brought back after he stole $7.74 worth of candy, a comment was made, but was he in a mental ward? So it was a comment in passing, and that's the precise evidence with respect to it. It was a colloquy. But it was not. And people can be in a mental ward voluntarily who are not dangerous to anybody. There's no question. And that is the kind of stereotyping that the ADA prohibits. The district court found and relied on two district court cases where individuals, for example, suffered from depression. No history of violence, no violent behavior. And the court and the employer wrongly stereotyped them as presenting a danger for violence. And that's what the ADA does prohibit. But it does not require that violent past be ignored. And contrary to what counsel suggested, the employer under the ADA may take into account violent acts, whether committed as a result of a mental disorder. Well, I think that's what opposing counsel said, too. I think it's the same thing as you, and that, I assume, is the reason for the jury instruction. That is correct. That those past violent acts may be taken into account. And that is the basis on which the employer made its decision. What became very troublesome in this trial, though, is when the employer representative was then asked to really show why its decision was uniform. The employer representative began to testify about how it handles persons convicted criminally of attempted murder. And Karen Howbrook, the legal counsel, testified that, I give the same advice. When someone is convicted criminally of attempted murder, they don't go into the home either. Counsel, I think we understand your position, and you have now exceeded your extra time. Thank you. Thank you both for your arguments. The case just argued is submitted.
judges: Leavy, Graber, Callahan